# IN THE SUPREME COURT OF TEXAS

═══════════
No. 13-0673
═══════════

ROY SEGER, ET AL., PETITIONERS,

v.

YORKSHIRE INSURANCE CO., LTD. , AND
OCEAN MARINE INSURANCE CO., LTD, RESPONDENTS

═══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════

**Argued September 3, 2015**

JUSTICE GREEN delivered the opinion of the Court.

After a tragic accident, a deceased derrick hand's parents sued the company that owned the drilling rig upon which the fatal accident occurred. The drilling company demanded that its commercial general liability (CGL) insurers defend it in the litigation. The insurers refused based on lack of coverage. The parents obtained a judgment against the drilling company, the company assigned its rights against the insurers to the parents, and the parents brought a *Stowers* action against the insurers. *See G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547–48 (Tex. Comm'n App. 1929, holding approved). After years of litigation, the jury returned a verdict in the parents' favor. The court of appeals reversed the trial court's judgment and rendered judgment that

the parents take nothing. *Yorkshire Ins. Co. v. Seger*, 407 S.W.3d 435, 443 (Tex. App.—Amarillo 2013, pet. granted). The court of appeals decided the issue of damages by applying our decision in *State Farm Fire & Casualty Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996). We decide the case on different grounds, holding that the parents failed to establish coverage, an essential element of any *Stowers* action. The evidence is legally insufficient to support the jury's finding that the deceased worker was not a leased-in worker; in fact, the evidence is conclusive that he was a leased-in worker under the definition given by the court of appeals. Coverage is therefore precluded as a matter of law. Because the coverage issue is dispositive, we do not address the damages issue. We affirm the court of appeals' judgment that the parents take nothing, but on different grounds.

## I. Facts and Procedural Background

Randall Seger (Randy) died in 1992 while working on a hydraulic-lift drilling rig that suddenly collapsed. At the time of the accident, Randy was employed by Employer's Contractor Services, Inc. (ECS), an oilfield service company. As an employee of ECS, Randy provided services to Diatom Drilling Co., L.P., which owned the drilling rig. ECS's president and founder, Cynthia Gillman, was also Diatom's general partner.

Diatom was insured under a CGL policy issued by fifteen offshore insurers, including lead insurers Yorkshire Insurance Co. and Ocean Marine Insurance Co. (collectively, the CGL Insurers). The "cover note" for Diatom's policy identified Diatom and ECS as the insureds, provided a maximum of $500,000 of coverage for any one bodily injury accident or occurrence, and contained a "condition" "Excluding Leased-In Employees/Workers." The policy also excluded employees, but

2

included independent contractors, and provided that the CGL Insurers "shall have the right and duty to defend any suit against the insured seeking damages."

## A. The Wrongful Death Action

The CGL Insurers were promptly notified of Randy's death, but Randy was erroneously referred to as a Diatom employee. The CGL Insurers did not investigate the incident and apparently conducted no inquiry or review of the policy to determine coverage. Rather, the CGL Insurers' strategy was to "keep a low profile" as they "[did] not wish to encourage any suit papers." Randy's parents, Roy Seger and Shirley Faye Hoskins (the Segers), ultimately brought a wrongful death action against Diatom and its partners in 1993, but the suit sat dormant for years.

In October 1998, the Segers made their first offer to settle the case within policy limits for $500,000. Diatom forwarded the offer to the CGL Insurers and made its first demand that the CGL Insurers provide a defense and settle the case within the policy limits. The CGL Insurers denied that Randy's death was a covered occurrence, notified Diatom that two of the CGL Insurers had become insolvent and therefore the demand exceeded policy limits, and refused to provide a defense or settle the case. In June 1999, the Segers made a second settlement offer within coverage limits, offering to accept $368,190 to "resolve all claims and all pending litigation arising out of the death of Randy Seger." The CGL Insurers rejected that offer. With a trial setting looming, Diatom made a second demand for a defense, asking the CGL Insurers to "come in and accept defense and acknowledge coverage on our behalf and settle the case within the policy limits." In June 2000, Diatom repeated that demand. The Segers made a third settlement offer prior to the March 2001 trial, offering to

3

accept $250,000 to "resolve all pending litigation between the parties." The CGL Insurers again declined to accept the settlement offer.

Before trial, the Segers nonsuited Diatom's individual partners, leaving Diatom as the only defendant. Diatom's counsel then withdrew from the case, claiming that Diatom was "unable to pay attorney fees."

At trial, Diatom appeared only through Gillman, its general partner, who is not a lawyer and had been subpoenaed to appear as a witness. Diatom did not announce ready when the proceeding was called, presented no opening or closing argument, offered no evidence, and did not cross-examine any witnesses. Gillman testified and was excused after her testimony. The CGL Insurers, despite having notice of the trial, elected not to attend or participate. The Segers presented evidence to prove both Diatom's liability and damages. After a full day of hearing evidence, the trial court found Diatom liable for Randy's death and awarded the Segers $15 million, plus interest.

Following entry of the judgment, Gillman contacted the CGL Insurers and inquired about what they intended to do. Receiving no answer, Diatom assigned to the Segers "any and all claims and causes of action" against the CGL Insurers, but reserved Diatom's right to recover its attorney's fees incurred in the underlying suit. In exchange, the Segers agreed to release Diatom's partners from any personal liability, even though they had already been nonsuited.

### B. The *Stowers* Action

The Segers filed a *Stowers* action, *see G.A. Stowers Furniture*, 15 S.W.2d at 544, against the CGL Insurers, seeking damages for wrongful refusal to defend Diatom and negligent failure to settle the Segers' wrongful death claim within the $500,000 limits of Diatom's CGL policy. Before the

4

*Stowers* action went to trial, all claims against the insolvent CGL Insurers were settled and dismissed, leaving only claims against Yorkshire and Ocean Marine (collectively, the *Stowers* Insurers). The Segers filed a nonsuit as to the other CGL Insurers.

The *Stowers* Insurers filed a third-party claim against Diatom and ECS for declaratory relief or for reformation of the CGL policy, arguing that the policy excluded coverage for Diatom's liabilities to leased-in workers. The *Stowers* Insurers also sought a declaration that Randy was a leased-in worker on the date of his death and that the *Stowers* Insurers had no duty to defend Diatom. At a pretrial hearing, the trial court denied the *Stowers* Insurers' motion for summary judgment and granted summary judgment in favor of Diatom and ECS on the issues of "coverage, demand within limits, fully adversarial relationship, and trial." The trial court then severed the third-party claims from the Segers' *Stowers* action.

The *Stowers* action went to trial on the remaining issues of negligence, causation, and damages. The jury returned a verdict in favor of the Segers as to the *Stowers* Insurers' negligence and causation, and the trial court directed verdict as to damages based on the underlying judgment against Diatom. In April 2006, the trial court entered a $37,213,592.01 final judgment in favor of the Segers.

## C. The *Stowers* Action Appeals

In the first appeal, the *Stowers* Insurers challenged some of the trial court's procedural rulings, the court's disposition of competing motions for summary judgment, and the court's rulings on motions for directed verdict. *Yorkshire Ins. Co. v. Seger*, 279 S.W.3d 755, 761 (Tex. App.—Amarillo

5

2007, pet. denied).[1]  The court of appeals affirmed the trial court's summary judgment that the Segers' $250,000 settlement demand was within the CGL policy limits.  *Id.* at 769, 775.  However, the court reversed the trial court on six other holdings.  *Id.* at 775.  On the issue of coverage, the court of appeals held that Diatom's CGL policy excluded claims for bodily injury or property damage brought by or on behalf of persons who performed work for the insured under an agreement with another allowing the temporary use of the worker.  *Id.* at 768.  Because there was more than a scintilla of evidence that the Segers' claims were excluded by the CGL policy and the Segers failed to negate the applicability of the leased-in worker exclusion as a matter of law, the court held that the trial court erred in granting summary judgment on the issue of coverage.  *Id.*  The court also held that the *Stowers* Insurers had raised a fact issue regarding whether the underlying judgment was the result of a fully adversarial trial, reversed the damages portion of the *Stowers* action judgment, and remanded the case for a new trial.  *Id.* at 773, 775.  The court of appeals referred to this opinion as *Seger I*, so we do the same.

The *Stowers* Insurers also appealed the trial court's summary judgment on the *Stowers* Insurers' third-party claim against Diatom and ECS for declaratory relief relating to the coverage exclusion in the severed action.  *Yorkshire Ins. Co. v. Diatom Drilling Co.*, 280 S.W.3d 278, 279 (Tex. App.—Amarillo 2007, pet. denied).[2]  The court of appeals reversed the trial court's judgment that the Segers' claims against Diatom were covered by Diatom's CGL policy.  *Id.* at 283.  In

---

[1] The court of appeals issued an opinion on April 30, 2007, but the court later granted the Segers' motion for rehearing and issued a substitute opinion on June 20, 2007.  *Seger I*, 279 S.W.3d at 759.

[2] The court of appeals issued an opinion on May 2, 2007, but the court later granted Diatom's and ECS's motion for rehearing and issued a substitute opinion on August 17, 2007.  *Diatom Drilling Co.*, 280 S.W.3d at 279.

6

reviewing the summary judgment order, the court of appeals stated that "the record reflects that all of Diatom's drilling workers were leased in from ECS." *Id.* at 282. The court, however, only determined the issue of the construction of the leased-in worker exclusion and rendered judgment declaring that the CGL policy "excluded liability for injury or death to leased-in employees/workers." *Id.* at 282–83. The case was then remanded to the trial court. *Id.* at 283.

## D. The *Stowers* Action on Remand

On remand, the *Stowers* case was tried in October 2011. The jury found that: (1) the *Stowers* Insurers negligently failed to settle the Segers' wrongful death claim against Diatom, proximately causing the underlying judgment against Diatom; (2) Randy was not an employee or leased-in worker of Diatom; and (3) the *Stowers* Insurers' wrongful refusal to provide Diatom a defense in the underlying action waived their right to control Diatom's defense. The trial court entered a judgment that (1) the Segers' claims were covered by Diatom's CGL policy; and (2) the underlying judgment in the wrongful death action was the result of a fully adversarial trial and thus established the Segers' damages as a matter of law. The trial court awarded damages to the Segers in the amount of the underlying judgment, $71,696,547.[3] The *Stowers* Insurers appealed.

## E. The Present *Stowers* Appeal

The *Stowers* Insurers raised seven issues on appeal, including issues related to Diatom's injury and damages, and coverage under Diatom's CGL policy. 407 S.W.3d at 438. The court of appeals reversed the trial court's judgment, holding that the evidence was legally and factually insufficient

---

[3] Shirley Hoskins died while the *Stowers* action was on remand. The trial court ordered that Don Hoskins, as independent executor of Shirley Hoskins's estate, be substituted in her place and that Roy Seger be substituted as administrator of Randy's estate.

7

to establish that Diatom was damaged by the *Stowers* Insurers. *Id.* at 438, 443. The court reasoned that the Segers relied exclusively on the inadmissible underlying judgment to prove damages, and that the trial court's judgment was the result of a proceeding that could not be characterized as a fully adversarial trial. *Id.* at 443. The court of appeals declined to reach the other issues raised on appeal, including the coverage issue, because it held that the damages issue was dispositive. *Id.* at 438. The Segers refer to this opinion as *Seger II*, so we do the same.

## II. The *Stowers* Issue

A *Stowers* cause of action arises when an insurer negligently fails to settle a claim covered by an applicable policy within policy limits. *See G.A. Stowers Furniture*, 15 S.W.2d at 547. To prove a *Stowers* claim, the insured must establish that (1) the claim is within the scope of coverage; (2) a demand was made that was within policy limits; and (3) the demand was such that an ordinary, prudent insurer would have accepted it, considering the likelihood and degree of the insured's potential exposure to an excess judgment. *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994).

Although the parties' focus has been on damages and whether the underlying trial was fully adversarial, the Segers cannot be entitled to any *Stowers* damages unless they establish all elements of a *Stowers* cause of action. *See id.* Therefore, we first consider the coverage element, although the court of appeals did not reach it. *See id.* at 848 ("We start with the proposition that an insurer has no duty to settle a claim that is not covered under its policy.").

8

## A. Coverage

The Segers argue that the *Stowers* Insurers had the burden to negate coverage and prove that they are entitled to enforce the policy exclusions. In a *Stowers* action, however, the burden is on the insured to prove coverage. *See State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38, 41 (Tex. 1998) (holding that the insured had the burden to show that the second element of his *Stowers* claim was met); *Garcia*, 876 S.W.2d at 848–49 (addressing coverage before moving on to the other elements of the *Stowers* claim); *Emp'rs Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988) (citation omitted) ("An insured cannot recover under an insurance policy unless facts are pleaded and proved showing that damages are covered by his policy."). Under the policy, Diatom's liabilities for bodily injuries to third parties, including independent contractors, were covered. Accordingly, to prevail under a *Stowers* cause of action, the Segers had the burden to prove that Randy was an independent contractor or other third party. To fully understand the coverage issue in this case, a more detailed factual background is helpful, so that is where we begin.

### 1. Diatom's Insurance

Diatom could not afford workers' compensation insurance for all of its employees. As an alternative to purchasing workers' compensation insurance, Gillman established an arrangement under which ECS—a company she created—employed the drilling workers and, as Diatom's independent contractor, provided those workers to Diatom. Neither Diatom nor ECS furnished workers' compensation insurance for the drilling workers.[4] Diatom instead purchased a Lloyd's-

---

[4] Instead of workers' compensation insurance, ECS purchased an accident, death, and dismemberment policy to cover its employees in the event of an accident. Diatom did maintain workers' compensation insurance for a few employees, to satisfy the requirement of some customers that Diatom provide a certificate of workers' compensation

of-London-type CGL policy spread among fifteen insurers (the CGL Insurers), including Yorkshire and Ocean Marine (the *Stowers* Insurers).[5]

Diatom's CGL policy provided a maximum of $500,000 coverage for any one bodily injury accident or occurrence. In the policy's "General Liability Standard Provisions," "bodily injury" is defined as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death." The policy expressly excludes "bodily injury to any employee of the Insured arising out of and in the course of his employment by the Insured." Although a common CGL policy endorsement excludes liability for injury to independent contractors, *see Certain Interested Underwriters at Lloyd's, London v. Stolberg*, 680 F.3d 61, 64 (1st Cir. 2012), Diatom's CGL policy expressly covered liability for injury to independent contractors.[6] Diatom's policy itself did not address leased-in workers, but the cover note to Diatom's CGL policy, which identified both Diatom and ECS as insureds, contained the following "condition": "To cover the Assured's Legal Liability to Third Parties as per American C.G.L. Form L6395a . . . Excluding Leased-in Employees/Workers."

## 2. Leased-In Exclusion

Diatom's CGL Policy does not define leased-in employees or workers. The parties agree that, when the policy was written in 1992, there was no generally accepted definition of "leased-in worker" or "leased-in employee." At that time, Texas had not yet adopted the Staff Leasing Services Act,

coverage. The record is undisputed that Randy was not covered by any such policy.

[5] Yorkshire assumed 16.472 percent of the coverage under the CGL policy, and Ocean Marine assumed 10 percent. *Diatom Drilling Co.*, 280 S.W.3d at 280.

[6] After the policy was issued, the CGL Insurers' representative confirmed: "If they mean independent contractors . . . [they] are covered in this policy."

which regulates the employee-leasing market. *See* TEX. LAB. CODE §§ 91.001–.062. The Texas Legislature adopted the Staff Leasing Services Act in 1995. Staff Leasing Services Act, 74th Leg., R.S., ch. 76, § 9.20(a), 1995 Tex. Gen. Laws 635 (codified at TEX. LAB. CODE §§ 91.001–.062).

The employee-leasing market expanded in the late 1980s and early 1990s because of the rapid increase in the cost of workers' compensation insurance. *See* Jill Williford, *Reformers' Regress: The 1991 Texas Workers' Compensation Act*, 22 ST. MARY'S L.J. 1111, 1122 (1991) (citation omitted) ("In Texas, the cost of workers' compensation insurance rose by 148% between 1985 and 1989."). As a result, many Texas businesses were unwilling or unable to participate in the workers' compensation system and opted out of coverage, "leaving an estimated 750,000 to one million workers without coverage." William O. Ashcraft & Anita M. Alessandra, *A Review of the New Texas Workers' Compensation System*, 21 TEX. TECH L. REV. 609, 610 (1990). In response to the increased insurance costs, businesses in Texas began to lease workers from staff leasing agencies so they could opt out of the workers' compensation system but still utilize the common law defenses against a workplace injury claim. *See* TEX. LAB. CODE § 406.033(a) (prohibiting employers that opt out of the workers' compensation system from asserting certain common law defenses to an employee's claim for damages resulting from personal injury or death within the course and scope of employment). This was accomplished by creating a contract through which the staff leasing agency became an independent contractor to the business. Then, because the workers were not employees of the business, they could not recover the benefits of the workers' compensation system from the business. *See id.* § 406.122(a).

11

Most CGL policies have provisions that exclude coverage for claims that would otherwise be covered under workers' compensation insurance, which is required in most states.[7] Steven P. Perlmutter, *The Law of "Leased Worker" and "Temporary Worker" Under a CGL Policy*, 45 TORT TRIAL & INS. PRAC. L.J. 761, 764 (2010). In fact, CGL policies were developed alongside workers' compensation insurance in the late 1800s and early 1900s. *See* Kenneth S. Abraham, *The Rise and Fall of Commercial Liability Insurance*, 87 VA. L. REV. 85, 87–88 (2001). When the adoption of workers' compensation schemes all over the country significantly reduced employers' liabilities to their employees, employers became interested in insuring their liabilities to members of the public as well. *Id.* at 88. Thus, public liability insurance was developed and refined over several decades to become the modern CGL insurance. *Id.* at 88–90. CGL policies were never meant to cover claims by employees against their employers. 9A STEVEN PLITT ET AL., COUCH ON INSURANCE § 129:11 (3d ed. 2016).

When employee leasing became more popular in the 1980s and 1990s, the question arose of whether liabilities to "leased workers" were covered under CGL policies. Perlmutter, *supra*, at 762. That question turns on whether the leased worker could be considered an employee under the policy; if so, then the insured's liability to the worker is excluded. *Id.* at 762–63. Most CGL policies now include some kind of express leased worker exclusion. *Id.* at 763. As mentioned above, though, Diatom's policy does not include a definition of "leased-in employee/worker."

---

[7] Texas and Oklahoma are currently the only states to allow private employers to opt out of the workers' compensation system. *See* Howard Berkes & Michael Grabell, *Opt-Out Plans Let Companies Work Without Workers' Comp*, NPR (Oct. 14, 2015), http://www.npr.org/2015/10/14/448544926/texas-oklahoma-permit-companies-to-dump-worker-compensation-plans.

The court of appeals addressed the coverage issue in two related appeals, reaching the same conclusion: Diatom's CGL policy excluded claims brought on behalf of leased-in workers. *Diatom Drilling Co.*, 280 S.W.3d at 283; *Seger I*, 279 S.W.3d at 767. In its determination, the court looked to dictionary definitions of "leased," "worker," and "in" to conclude, in two opinions, that the cover note condition:

> unambiguously excludes from coverage all claims for a named insured's liability for bodily injury or property damage brought by or on behalf of persons that perform work for the insured under an agreement with another allowing temporary use of the worker, even though the leased worker would not be an employee of insured.

*Diatom Drilling Co.*, 280 S.W.3d at 283; *Seger I*, 279 S.W.3d at 767.

### 3. Prior Coverage Determination

The *Stowers* Insurers rely on statements in the court of appeals' opinion in the severed third-party case, *Diatom Drilling Co.*, arguing that the court held that Randy was a leased-in worker.[8] The opinion states: "At the time of the formation of the CGL policy and through its effective period, the record reflects that all of Diatom's drilling workers were leased in from ECS." *Diatom Drilling Co.*, 280 S.W.3d at 282. The Segers argue that the court of appeals made no such holding and that coverage required resolution of a fact issue at trial post-remand. They cite evidence supporting their position that Randy was an independent contractor and rely on the jury's finding that Randy was not Diatom's employee or leased-in worker. Despite the court of appeals having defined the leased-in worker exclusion, we conclude that the court stopped short of specifically holding that Randy was

---

[8] The *Stowers* Insurers also made this argument to the trial court and properly objected multiple times to the presentation of the coverage issue to the jury. They properly preserved error, and we can consider this issue. *See* TEX. R. APP. P. 33.1(a).

13

a leased-in worker at the time of his death or that the Segers' claims were not covered. The court of appeals' statement in *Diatom Drilling Co.* was dictum and, therefore, was not binding on the trial court.

This Court has defined dictum as: "An opinion expressed by a court, but which, not being necessarily involved in the case, lacks the force of an adjudication; . . . an opinion of a judge which does not embody the resolution or determination of the court, and made without argument, or full consideration of the point." *Grigsby v. Reib*, 153 S.W. 1124, 1126 (Tex. 1913). We have recognized two types of dicta: judicial dictum and obiter dictum. *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 773 (Tex. 1964). Obiter dictum is not binding as precedent. *Lund v. Giauque*, 416 S.W.3d 122, 129 (Tex. App.—Fort Worth 2013, no pet.); *see Elledge v. Friberg–Cooper Water Supply Corp.*, 240 S.W.3d 869, 870 (Tex. 2007) (per curiam) (rejecting the label of "obiter dictum" for a prior statement and explaining that the statement should have been followed). Judicial dictum is "a statement made deliberately after careful consideration and for future guidance in the conduct of litigation." *Lund*, 416 S.W.3d at 129; *see Palestine Contractors, Inc.*, 386 S.W.2d at 773. As such, "[i]t is at least persuasive and should be followed unless found to be erroneous." *Palestine Contractors, Inc.*, 386 S.W.2d at 773 (citing *R.R. Comm'n v. Aluminum Co. of Am.*, 380 S.W.2d 599, 601 (Tex. 1963)).

When determining whether a statement is dictum, we look to the language and structure of the opinion as we did in *Palestine Contractors, Inc. Id.* In that case, we determined whether language in *Gattegno v. The Parisian*, 53 S.W.2d 1005 (Tex. Comm'n App. 1932, holding approved), was dictum. *Id.* The language appeared after the Commission of Appeals' determination on the

14

merits, and set out rules to be followed upon remand to the trial court even though those issues had not been raised on appeal. *Id.* We held that the language was judicial dictum and should be followed by the trial court. *Id.* Similarly, in *Elledge*, we held that the court of appeals mistakenly characterized statements from two of our opinions regarding a statute of limitations period as obiter dictum. 240 S.W.3d at 870. After looking to the language of each opinion, we rejected the obiter dictum label and held that although the language was not essential to the outcome of either opinion, it should have been followed. *Id.*

Here, the court of appeals was reviewing a summary judgment order. *Diatom Drilling Co.*, 280 S.W.3d at 279. In the trial court, the *Stowers* Insurers requested declaratory judgment that (1) the policy excluded liability for injury or death to leased-in workers; (2) Randy was a leased-in worker; and (3) the *Stowers* Insurers had no duty to defend Diatom. The trial court rejected the *Stowers* Insurers' declaratory judgment claim and granted summary judgment in favor of Diatom and ECS. *Id.* at 281. In reviewing the trial court's summary judgment order, the court of appeals addressed only the construction of the leased-in worker exclusion. *Id.* at 282. The statement in question appears in the middle of a paragraph discussing the *Stowers* Insurers' argument that the exclusion should be interpreted to exclude "leased-in workers." *Id.* The opinion contains no other indication that the court of appeals intended to hold that Randy was a "leased-in worker" as a matter of law. In its conclusion, the court of appeals only rendered judgment that "the CGL policy . . . excluded liability for injury or death to leased-in employees/workers," without mention of whether Randy was a leased-in worker. *Id.* at 284. The court then remanded the case to the trial court for further proceedings. *Id.*

15

Based on the language of the opinion and the surrounding circumstances, we cannot say that the court of appeals held that Randy was a leased-in worker. This is not a case similar to *Palestine Contractors, Inc.*, where the Commission of Appeals deliberately set out rules to be followed. 386 S.W.2d at 773. Nor is it similar to *Elledge*, where our earlier statements about applicability of a statutory limitations period should have been followed. 240 S.W.3d at 870. The court of appeals' statement in this case was made in the context of reviewing record evidence to make a determination on the construction of policy language. *Diatom Drilling Co.*, 280 S.W.3d at 282. The statement was made "without argument, or full consideration of the point." *Grigsby*, 153 S.W. at 1126. Accordingly, we hold that the statement was obiter dictum and had no precedential value. The issue of coverage was therefore properly before the jury.

### 4. Burden of Proof

Our inquiry into the coverage issue, however, does not end there. The Segers argue that the burden rests on the *Stowers* Insurers to prove that they are entitled to the contractual defense of no-coverage. The court of appeals held that the *Stowers* Insurers had the burden to prove that "the Segers' claims are not covered by the CGL policy." *Seger I*, 279 S.W.3d at 765. That court misplaced the burden, however. *See Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008) ("[T]here is no 'right' of noncoverage that is subject to being waived by the insurer."). In any insurance action, "[a]n insured cannot recover under an insurance policy unless facts are pleaded and proved showing that damages are covered by his policy." *See Block*, 744 S.W.2d at 944 (citing *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965)). "Initially, the insured has the burden of establishing coverage under the terms of the policy." *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*,

16

460 S.W.3d 597, 603 (Tex. 2015) (citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010)). "To avoid liability, the insurer then has the burden to plead and prove that the loss falls within an exclusion to the policy's coverage." *Id.* "The insurer has neither a 'right' nor a burden to assert noncoverage of a risk or loss until the insured shows that the risk or loss is covered by the terms of the policy." *Ulico Cas. Co.*, 262 S.W.3d at 778. To prove coverage, the plaintiff must establish that the injury or damage is the type covered by the policy. *See Royal Indem. Co.*, 388 S.W.2d at 179–81 (explaining that the plaintiff had the burden to prove that the damage to his automobiles was within the policy coverage); *Bethea v. Nat'l Cas. Co.*, 307 S.W.2d 323, 324 (Tex. Civ. App.—Beaumont 1957, writ ref'd) (holding that to recover under the policy for the insured's death caused by "'falling material,' it was necessary that the plaintiff plead and prove that 'while walking on a public street or sidewalk' the assured was fatally injured or killed by being struck by 'a falling signboard, awning, brick or stone from a building'"). The plaintiff must also establish that the injury or damage was incurred at a time covered by the policy. *Block*, 744 S.W.2d at 944. Finally, the plaintiff must establish that the injury or damage was incurred by a person whose injuries are covered by the policy. *See Thompson v. Travelers Indem. Co. of R.I.*, 789 S.W.2d 277, 278–79 (Tex. 1990) (determining whether a jockey was an employee of a race track and therefore covered under the race track's workers' compensation insurance). Only by establishing each of these elements—that a covered injury or loss was incurred at a time covered by the policy and incurred by a person whose injuries are covered by the policy—can a plaintiff prove coverage, and only then does the burden shift to the insurer to prove that a coverage exclusion applies. *See Ulico Cas. Co.*, 262 S.W.3d at 782 ("[T]he insured bears the burden to show that a policy is in force and that the risk

17

comes within the policy's coverage."). As such, each of these elements of coverage is a precondition to coverage, not an exception. *See Block*, 744 S.W.2d at 944 ("[T]he time of the insured's damages is a precondition to any coverage rather than an exception to general coverage.").

A *Stowers* action is no different. A *Stowers* plaintiff cannot recover under a *Stowers* cause of action without first satisfying the precondition of establishing each element of coverage. *See Maldonado*, 963 S.W.2d at 41 (holding that the insured had the burden to show that the second element of his *Stowers* claim was met). Accordingly, the Segers, as Diatom's assignees, had the burden to prove that Diatom was covered for Randy's death under its CGL policy. The only coverage element at issue here is whether the injury was incurred by a person whose injuries are covered by the policy.

### 5. The Segers' Initial Coverage Burden

Although it was an element essential to recovery, the Segers did not request, and the trial court did not submit, a jury question on the Segers' initial coverage burden as to whether Randy was a person whose injuries or death were covered under Diatom's CGL policy.[9] Instead, the Segers rely on the trial court's implied finding to support their coverage argument. In its judgment, the trial court concluded that, based on the jury's answers,[10] the Segers' claim was covered by Diatom's CGL

---

[9] In the jury charge, the trial court instructed the jury that it would "later determine if the Seger claim was covered under the Diatom CGL Policy."

[10] It is unclear what the trial court meant because there were no jury questions on the Segers' initial coverage burden. But, because the jury found that the leased-in worker exclusion did not apply, we can conclude only that the trial court determined that the Segers satisfied their initial coverage burden.

18

policy. The trial court's judgment can be supported only by a finding that Randy was an independent contractor or other third party.

"When a court makes fact findings but inadvertently omits an essential element of a ground of recovery or defense, the presumption of validity will supply by implication any omitted unrequested element that is supported by evidence." *In re Estate of Miller*, 446 S.W.3d 445, 450 (Tex. App.—Tyler 2014, no pet.); *see Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam) (explaining that "where no findings of fact . . . are filed or requested, it is implied that the trial court made all the necessary findings to support its judgment"). Although the Segers failed to request a jury question on whether Randy was a third party or an independent contractor, because the trial court found that the Segers' claims were covered, we presume that the trial court made all implied findings necessary to the validity of the judgment; i.e., Randy was an independent contractor or other third party. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83–84 (Tex. 1992) (quoting *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex. 1980)) ("[W]here no findings of fact or conclusions of law are filed or requested, it will be implied that the trial court made all the necessary findings to support its judgment."). The Segers' failure to request a jury question on Randy's status as a third party or independent contractor is not fatal to their claims.

We note that the Segers only pled coverage generally, alleging that Randy's death was a covered occurrence under the terms of the policy, "and all other requirements of coverage were met." While the Segers never explicitly alleged that Randy was a third party, the Segers' general pleading is sufficient in this case because we "construe the pleadings liberally" in favor of coverage when reviewing a *Stowers* action. *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008);

19

*see also Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 643 (Tex. 2005) ("[I]n the event of an ambiguity, we construe the pleadings liberally, resolving any doubt in favor of coverage."). As explained above, CGL policies are broad, general policies meant to cover the insured for damages caused by covered injuries to third parties, including the general public, as a result of the insured's business operations. *See Gehan Homes, Ltd. v. Emp'rs Mut. Cas. Co.*, 146 S.W.3d 833, 838 (Tex. App.—Dallas 2004, pet. denied) ("The insurer's duty to defend arises when a third party sues the insured on allegations that, if taken as true, potentially state a cause of action within the terms of the policy."); PLITT, *supra*, at § 129:1 ("[C]ommercial general liability insurance policies provide for broad coverage generally."); Perlmutter, *supra*, at 764 (noting that CGL policies are "designed to cover an employer's liability to third persons for the negligence of its agents, servants, and employees"). Here, Cynthia Gillman, acting on behalf of Diatom and ECS, procured the CGL policy. The policy lists the insureds as "Diatom Drilling Company" and "Employer Contractor Services, Inc." The policy does not include employees of Diatom or ECS as insureds—in fact it expressly excludes bodily injury to employees from coverage—and Randy is not otherwise included as a "person[] insured" as described in the policy. Therefore, because Randy was not a party to the insurance policy, he is necessarily a third party. *See Third Party*, BLACK'S LAW DICTIONARY 1708 (10th ed. 2014) ("Someone who is not a party to a lawsuit, agreement, or other transaction but who is usu[ally] somehow implicated in it . . . ."). Therefore, the policy covers Diatom's liabilities to Randy unless one of the policy exclusions applies.

20

## 6. The *Stowers* Insurers' Exclusion Burden

### a. Enforcement by the *Stowers* Insurers

To recover under a *Stowers* cause of action, the Segers must prove that their claim meets all of the *Stowers* elements, beginning with coverage. *See Garcia*, 876 S.W.2d at 849. The *Stowers* Insurers are not obligated to defend against or offer to settle a claim that is not within the scope of coverage. *See id.* at 848 ("If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured."). Because we hold that the Segers met their initial burden to prove coverage, the burden shifts to the *Stowers* Insurers to prove that the Segers' claim is excluded from coverage under the policy. *See JAW The Pointe, L.L.C.*, 460 S.W.3d at 603. The Segers, however, argue that the *Stowers* Insurers cannot enforce the policy exclusions because the *Stowers* Insurers are unauthorized insurers.

Under Texas Insurance Code section 101.201(a), "[a]n insurance contract effective in this state and entered into by an unauthorized insurer is unenforceable by the insurer." TEX. INS. CODE § 101.201(a). Neither party disputes that the *Stowers* Insurers are unauthorized to write insurance in Texas.[11] The *Stowers* Insurers, however, contend that because they are eligible surplus lines insurers, they qualify for the exception provided in section 101.201(b). *See id.* § 101.201(b) (providing an exception to section 101.201(a)'s limitation to eligible surplus lines insurers). As we recognized in *Mid-American Indemnity Insurance Co. v. King*, "the general term 'unauthorized insurers' does

---

[11] An insurer may not "do an act that constitutes the business of insurance . . . except as authorized by statute." TEX. INS. CODE § 101.102(a). To be authorized to write insurance in Texas, the insurer must have a certificate of authority obtained from the Department of Insurance. *Id.* §§ 801.051(a), .052. "The certificate of authority must state the specific kinds of insurance authorized under the certificate." *Id.* § 801.052.

include eligible surplus lines insurers, because by definition such insurers are unlicensed." 22 S.W.3d 321, 326 (Tex. 1995). Although the Insurance Code levies harsh penalties on unauthorized insurers, the Legislature carved out several exceptions for eligible surplus lines insurers, such as the exception in section 101.201(b). *See Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 88–89 (Tex. 2006); *Mid-Am. Indem. Ins.*, 22 S.W.3d at 326. Under section 101.201(b), the limitation in section 101.201(a) "does not apply to insurance procured by a licensed surplus lines agent from an eligible surplus lines insurer . . . that are reported and on which premium tax is paid in accordance with Chapter 225." TEX. INS. CODE § 101.201(b).

Under Chapter 981 of the Insurance Code, to be an eligible surplus lines insurer, the insurer must provide proof of authorization to write insurance from its domiciliary state or country to the Texas Department of Insurance, must maintain at least $15 million in capital and surplus,[12] and "must comply with all applicable nationwide uniform standards adopted by this state." TEX. INS. CODE §§ 981.051(a), .057(a), .066. Additionally, "[a]n agent licensed by this state may not issue or cause to be issued an insurance contract with an eligible surplus lines insurer unless the agent possesses a surplus lines license issued by the department." *Id.* § 981.202.

Despite the Segers' arguments to the contrary, the *Stowers* Insurers did produce evidence to establish that they were eligible surplus lines insurers and that the CGL policy was procured through a licensed agent. During trial, the *Stowers* Insurers introduced two certificates certified by the custodian of records at the Department of Insurance that conclusively show that both *Stowers* Insurers

---

[12] The minimum surplus and capital requirement "does not apply to alien surplus lines insurers listed on the Quarterly Listing of Alien Insurers maintained by the International Insurers Department, National Association of Insurance Commissioners." TEX. INS. CODE § 981.057(b).

were eligible surplus lines insurers at the time the policy issued in January 1992. *See City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex. 2005) (quoting *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519–20 (Tex. 2002) (plurality op.)) (holding that an appellate court "cannot 'disregard undisputed evidence that allows of only one logical inference'"). The *Stowers* Insurers also presented evidence that Diatom procured the CGL policy from a licensed surplus lines agent.

As recognized by the court of appeals in *Seger I*, the insurance was placed through London American Risk Specialists, Inc. (LARSI). 279 S.W.3d at 765. At the time the policy was issued, LARSI was licensed to provide surplus lines insurance as a managing general agency. *Id.* Under Insurance Code section 981.220, however, a managing general agent can accept surplus lines business only through a licensed general property and casualty agent. TEX. INS. CODE. § 981.220. Therefore, LARSI was required to go through a licensed general property and casualty agent to provide surplus lines insurance to Diatom and ECS. *See id.* Cynthia Gillman's testimony shows that she obtained the CGL policy at issue from Dan Pavillard. It is undisputed that Pavillard was a licensed property and casualty agent at the time the policy was issued. The Segers argue that because the CGL policy lists AMM Insurance Agency, Inc. as the "producing agent," it was AMM Insurance and not Pavillard that procured the policy for Diatom and ECS. The *Stowers* Insurers, however, produced a document, certified by the Department of Insurance, showing that, at the time the policy was issued, Pavillard was doing business as AMM Insurance. Therefore, it was Pavillard, acting through AMM Insurance, who procured the policy for Diatom and ECS. Because Pavillard was a licensed property and casualty agent at the time the policy was issued, the CGL policy was procured through a licensed agent as contemplated by Insurance Code section 101.201(b). *See id.* § 101.201(b).

23

The *Stowers* Insurers, however, failed to present evidence that the premium tax was paid, and therefore, do not qualify for the exception in section 101.201(b). *See id.* In Chapter 225, the Insurance Code imposes a 4.85-percent tax rate on surplus lines insurance gross premiums. *Id.* § 225.004(a). A surplus lines agent must file a tax report and pay the tax on behalf of the insurer. *Id.* § 225.008(b). Although the agent is responsible for paying the tax, to qualify for the section 101.201(b) exception, the insurer must present evidence that the premium tax was paid. *See id.* § 101.201(b). Because the *Stowers* Insurers did not present evidence that the premium tax was paid, they are limited by section 101.201(a)'s restriction on unauthorized insurers, and the insurance policy is "unenforceable" by the *Stowers* Insurers. *See id.* § 101.201(a).

The Segers argue that because the policy is "unenforceable" by the *Stowers* Insurers under section 101.201(a), the *Stowers* Insurers are unable to plead or prove that the policy exclusions preclude coverage of the Segers' claims. Additionally, the Segers argue that under Insurance Code section 981.005(a), the *Stowers* Insurers are unable to enforce the policy exclusions because the jury found in Questions 2 through 6 that material and intentional violations of Chapter 981 occurred. Specifically, the jury found that the agent did not complete a diligent search for authorized insurance,[13] the policy did not contain the requisite informational language in 11-point type,[14] the

---

[13] *See id.* § 981.004(a)(1) ("An eligible surplus lines insurer may provide surplus lines insurance only if: . . . the full amount of required insurance cannot be obtained, after a diligent effort, from an insurer authorized to write and actually writing that kind of insurance in this state.").

[14] *See id.* § 981.101(b) ("A surplus lines document must state, in 11-point type, the following: This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code requires payment of a _____ (insert appropriate tax rate) percent tax on gross premium.").

24

policy did not contain the address of each insurer,[15] the agent did not make a reasonable effort to determine the financial condition of each insurer,[16] and the agent did not verify that all of the insurers were eligible to write insurance in Texas.[17] Because of the jury's findings, the Segers argue that the *Stowers* Insurers cannot enforce the policy exclusions under section 981.005(a). The Segers' interpretation of the term "unenforceable" in this context would essentially invalidate policy exclusions and allow *Stowers* plaintiffs to write them out of insurance policies.

When interpreting a statute, "[w]e look first to the 'plain and common meaning of the statute's words.'" *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003) (quoting *State ex. Rel. State Dept. of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002)). Therefore, we first consider what "unenforceable" means in the context of the statute. Under section 981.005(a), "an insurance contract obtained from an eligible surplus lines insurer is . . . valid and enforceable as to all parties" unless a material and intentional violation of Chapter 981 exists. TEX. INS. CODE § 981.005(a). "A material and intentional violation of [Chapter 981, however,] does not preclude the insured from enforcing the insured's rights under the contract." *Id.* § 981.005(b). Similarly, section 101.201(a) restricts an insurer's ability to enforce a policy when the insurer is unauthorized, but the section still allows the insured to enforce the contract to obtain "the full amount of a claim or loss

---

[15] *See id.* § 981.101(c)(4), (5) ("A surplus lines document must show: . . . the name and address of . . . the insured[,] . . . the insurer[,] and . . . the insurance agent who obtained the surplus lines coverage[ ] and[,] if the direct risk is assumed by more than one insurer[,] the name and address of each insurer . . . .").

[16] *See id.* § 981.211(a) ("A surplus lines agent must make a reasonable effort to determine the financial condition of an eligible surplus lines insurer before placing insurance with that insurer.").

[17] *See id.* § 981.210 ("A surplus lines agent may not place surplus lines coverage with an insurer unless: (1) the insurer meets the eligibility requirements of [this Chapter] . . . .").

under the terms of the contract." *Id.* § 101.201(a). Therefore, while the policy is unenforceable as to the insurer under certain circumstances, the insured is still able to enforce the policy under the terms of the contract. *Id.*

A voidable policy or agreement is one that "can be affirmed or rejected at the option of one of the parties." *Voidable Contract*, BLACK'S LAW DICTIONARY 398 (10th ed. 2014); *see* RESTATEMENT (SECOND) OF CONTRACTS § 7 (AM. LAW INST. 1981) ("A voidable contract is one where one or more parties have the power, by a manifestation or election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance."). The Restatement (Second) of Contracts recognizes that voidable contracts can be "defined as one type of unenforceable contract." RESTATEMENT (SECOND) OF CONTRACTS § 8 cmt. a (AM. LAW INST. 1981). Because the statute at issue, under certain circumstances, allows one party to elect to enforce the contract while preventing the other party from doing so, the statute makes the policy voidable. *See* TEX. INS. CODE §§ 101.201, 981.005. As a result, an insured in this situation has the option to either enforce its rights "under the contract," or rescind the contract. *See id.* § 981.005(b); *Urrita v. Decker*, 992 S.W.2d 440, 443 (Tex. 1999).

To protect the insured's rights under the policy it bargained for, we have held in similar situations that the insured may elect to either rescind or enforce a policy that is unenforceable by the insurer. *See, e.g.*, *Urrutia*, 992 S.W.2d at 443 (holding that agreements written on unapproved insurance forms were unenforceable, but allowing the insured to enforce the terms of the agreement or "elect to rescind it"). In *Urrutia*, a truck-leasing company provided liability insurance to its lessee. *Id.* at 441. The insurance, however, was not written on a form approved by the State Board of

26

Insurance. *Id.* at 443. We held that if an insurance policy is written on an unapproved form, the insurer may not enforce it. *Id.* Because the insurer was unable to enforce the policy, the policy was voidable. *Id.* Accordingly, the insured, the lessee in *Urrutia*, could elect to rescind or enforce the voidable policy. *Id.* However, if an insured elects to enforce the policy, "he or she must do so under the agreed terms." *Id.* at 443–44; *see Dairyland Cty. Mut. Ins. Co. of Tex. v. Roman*, 498 S.W.2d 154, 158 (Tex. 1973) (holding that while a contract is voidable at the election of a minor, the minor "is not entitled to enforce portions that are favorable to him and at the same time disaffirm other portions that he finds burdensome. He is not permitted to retain the benefits of a contract while repudiating its obligations.").

The principle we set out in *Urrutia* also holds true in this case. Because the Segers, as *Stowers* plaintiffs, rely on Diatom's CGL policy to bring their *Stowers* action, they are also bound by the policy's terms. *See Jackson v. Thweatt*, 883 S.W.2d 171, 174 (Tex. 1994) (quoting *FDIC v. Bedsloe*, 989 F.2d 805, 810 (5th Cir. 1993)) (recognizing that an assignee "stands in the shoes of his assignor"). Despite the fact that the burden to prove policy exclusions rests on the *Stowers* Insurers, the exclusions are provisions that ultimately determine coverage, and the Segers must accept those terms if they want to enforce the policy itself. *See* TEX. INS. CODE § 981.005(b) ("A material and intentional violation of this chapter . . . does not preclude the insured from enforcing the insured's rights *under the contract*." (emphasis added)); TEX. INS. CODE § 101.201(a) (recognizing that an insured can recover "the full amount of a claim or loss *under the terms of the contract*" from a person who assists in the procurement of an insurance contract from an unauthorized insurer (emphasis added)); *Urrutia*, 992 S.W.2d at 443.

27

We reject the Segers' arguments that section 101.201 and section 981.005 preclude the *Stowers* Insurers from asserting policy exclusions in a *Stowers* case in which the plaintiffs rely on the policy to present their case. In such a case, the plaintiffs bringing a claim to enforce the policy and asserting coverage under the policy must accept all policy terms and cannot avoid unfavorable ones. Therefore, the *Stowers* Insurers may plead and prove that the policy exclusions, as terms of the contract, preclude coverage as a matter of law.

### b. Application of Exclusions

At trial, the jury found that Randy was neither a leased-in worker nor an employee of Diatom. First, we consider the jury's finding that Randy was not an employee of Diatom.[18] When reviewing the legal sufficiency of the evidence, we consider whether the evidence at trial would enable a reasonable and fair-minded juror to reach the verdict in question. *City of Keller*, 168 S.W.3d at 827.

> Evidence is legally insufficient "when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact."

*Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Our review is restricted to the jury charge as submitted when there was no objection to the instruction. *See Colombia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 254 (Tex. 2008). "[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object

---

[18] While the jury's finding on whether Randy was Diatom's employee was not appealed, we must consider the coverage issue, which subsumes the employee determination. *See* TEX. R. APP. 38.1(f) (explaining that "[t]he statement of an issue or point will be treated as covering every subsidiary question that is fairly included").

to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (citing TEX. R. CIV. P. 272, 274, 278, 279). Even if another legal theory was argued to the jury and explained by the lawyers in argument, we are bound by the instructions given to the jury and presume that the jury followed those instructions. *Colombia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 861–62 (Tex. 2009). "Statements from lawyers as to the law do not take the place of instructions from the judge as to the law. It is the trial court's prerogative and duty to instruct the jury on the applicable law." *Id.* at 862.

Here, the jury was instructed, in Instruction No. 5, that an "employee" "is a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of the work and not merely the result to be accomplished." During trial, the *Stowers* Insurers argued that Randy was an employee of Diatom because ECS was Diatom's alter ego. Despite the *Stowers* Insurers' arguments at trial, the jury was not instructed on alter ego, and the *Stowers* Insurers neither objected to Instruction No. 5 nor requested an instruction on alter ego. Therefore, we cannot consider those legal theories when reviewing the legal sufficiency of the jury's finding. *See Osterberg*, 12 S.W.3d at 55.

Based on the instruction provided to the jury in this case, we hold that the evidence was legally sufficient to support the jury's finding that Randy was not an employee of Diatom. Both parties presented testimony and evidence that Randy was an employee of ECS. Because the jury was not instructed on alter ego, it was entitled to disregard the *Stowers* Insurers' evidence and argument that ECS really operated as the alter ego of Diatom, and find that Randy was not Diatom's employee.

29

Next, we review the jury's finding that Randy was not a leased-in worker. The *Stowers* Insurers argue that the evidence in the record conclusively establishes that Randy was a leased-in worker as a matter of law under the definition supplied by the court of appeals in both *Diatom Drilling Co.* and *Seger I*. In those opinions, the court of appeals concluded as a matter of law that the term "leased-in employees/workers" was defined as "persons that perform work for the insured under an agreement with another allowing temporary use of the worker, even though the leased worker would not be an employee of insured." *Diatom Drilling Co.*, 280 S.W.3d at 283; *Seger I*, 279 S.W.3d at 767. This definition was submitted to the jury in Instruction No. 6 of the jury charge.

When a party properly preserves error by objecting to an erroneous definition used in the jury charge, we measure the legal sufficiency of the evidence against the definition that should have been used in the charge. *St. Joseph Hosp.*, 94 S.W.3d at 530. In this case, the *Stowers* Insurers properly objected to the submission of the definition of "leased-in worker" in Instruction No. 6 and submitted their own version of the instruction, which the trial court rejected. The *Stowers* Insurers contend that the definition in the jury charge should have included only the definition of "leased-in worker" as supplied by the court of appeals, and that the charge was improper because the definition included "beneficial words not found in the court of appeals' definition." "Whether a definition used in the charge misstated the law is a legal question," which we review de novo. *Id.* at 525.

While trial courts have wide discretion in determining the necessity of explanatory instructions and definitions in the jury charge, the trial court must give definitions of legal and other technical terms. *See H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 23 (Tex. 1998); *Standley v. Sansom*, 367 S.W.3d 343, 350 (Tex. App.—San Antonio 2012, pet. denied) (citing TEX. R. CIV. P. 277, which

states that "[t]he court shall submit such instruction and definitions as shall be proper to enable the jury to render a verdict"). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (citing TEX. R. CIV. P. 278). Including definitions of words of ordinary meaning that are "readily understandable by the average person" in the jury charge is unnecessary. *Standley*, 367 S.W.3d at 350.

When an appellate court remands a case to the trial court, the trial court "has no authority to take any action that is inconsistent with or beyond the scope of that which is necessary to give full effect to the appellate court's judgment and mandate." *Phillips v. Bramlett*, 407 S.W.3d 229, 234 (Tex. 2013); *see also* TEX. R. APP. P. 51.1(b) (enforcement of judgment). Here, the court of appeals rendered judgment on the definition of a legal term in Diatom's CGL policy. *Diatom Drilling Co.*, 280 S.W.3d at 283. Accordingly, the trial court was bound by the court of appeals' definition and was required to enforce it. *See City of San Antonio v. Gonzales*, 737 S.W.2d 78, 80 (Tex. App.—San Antonio 1987, no writ) ("[T]he trial court was bound to apply the legal principles pronounced by [the court of appeals]."). While the court of appeals' definition of "leased-in worker" was included in the jury instruction, the dictionary definitions of "lease," "worker," and "in" were also included in the instruction. Although the definitions of those words were used by the court of appeals to reach its conclusion on the ultimate definition of "leased-in worker," inclusion of those definitions in Instruction No. 6 was completely unnecessary. Any error was harmless, however, because the proper definition was included in the instruction. *See* TEX. R. APP. P. 61.1 (standard for reversible error).

31

Because those additional definitions were unnecessary, we apply only the court of appeals' ultimate definition to our legal sufficiency review: A leased-in worker is a person who performs work for the insured under an agreement with another allowing temporary use of the worker, even though the leased worker would not be an employee of the insured.[19] *Diatom Drilling Co.*, 280 S.W.3d at 283; *Seger I*, 279 S.W.3d at 767; *see also St. Joseph Hosp.*, 94 S.W.3d at 530 (explaining that we measure the legal sufficiency of the evidence against the definition that should have been used). In conducting our review, we consider each element of the definition in light of the evidence in the record. *See St. Joseph Hosp.*, 94 S.W.3d at 530–31.

The *Stowers* Insurers argue that the evidence conclusively proves that Randy was a leased-in worker as a matter of law. The Segers argue that because Randy was an employee of ECS, which was an independent contractor to Diatom, Randy was also an independent contractor. However, under the definition at issue, the two arguments are not mutually exclusive. The definition first calls for "a person who performs work for the insured." There is no doubt that Randy was a person or that he performed work for Diatom as a derrick hand. Both the Segers and the *Stowers* Insurers have presented conclusive and undisputed evidence that Randy was working at the Diatom drilling site when the accident occurred.

Both parties also presented conclusive and undisputed evidence of the existence of "an agreement with another allowing temporary use of the worker." The Segers argue that for Randy to be a leased-in worker, there would need to be a lease between ECS and Diatom, but that is not what

---

[19] It should be noted, however, that this definition of "leased-in worker" applies only to the facts of this case based on the holdings of the court of appeals' opinions in *Seger I* and *Diatom Drilling Co.* We do not suggest that the definition of "leased-in worker" used in this case should be applied in any other case.

the definition given by the trial court required. The definition required only that there be an agreement between the insured and the entity providing the worker for temporary use of that worker. The Segers entered that agreement into evidence at trial.[20] The agreement, titled "Contract for Personnel Services," was signed by Gillman twice, both as the general partner of Diatom and as the president of ECS. The lawyer for Diatom prepared the agreement in December 1990 as a way for Gillman and Diatom to have workers on Diatom's drilling rigs without having to pay for workers' compensation.[21]

The express terms of the agreement offered into evidence show that the agreement was only for the temporary use of personnel. The agreement states that ECS would "provide Diatom with all necessary personnel for the operation of one or more drilling rigs in accordance with the needs of Diatom." Under these terms, ECS would provide Diatom with workers only "as needed" depending on Diatom's project. If Diatom was raising an oil rig, ECS would send out derrick hands, tool pushers, and other necessary personnel to raise the rig. Not every worker was necessary for every stage of Diatom's drilling business, so the use of each worker was only temporary. The evidence shows that Randy was hired by ECS on March 18, 1991, and worked on seven rigs for Diatom before

---

[20] The *Stowers* Insurers also presented evidence of an agreement between Diatom and ECS through the testimony of one of the Segers' expert witnesses.

> Q: The ECS contract that we're just talking about, that's an agreement between ECS and Diatom, isn't it?
> A: It is.
> Q: And it's an agreement between ECS and Diatom to perform work for the insure[d]. True?
> A: It is.

[21] At the same time, the lawyer also incorporated ECS as a provider of personnel services for Diatom.

his death in July 1992.[22] Randy was a temporary worker on each of those seven rigs because his services as a derrick hand would not be needed unless Diatom entered into a new drilling contract for a similar project.

Finally, the last section of the definition, "even though the leased worker would not be the employee of the insured," has also been proven by conclusive and undisputed evidence from both parties. The Segers produced Randy's employment file with ECS and the agreement between ECS and Diatom, which stated that the workers would be the employees of ECS and not Diatom. In addition, they produced testimony from Gillman and two experts that Randy was an employee of ECS. The *Stowers* Insurers also produced testimony that Randy was an employee of ECS.

The Segers argue that Randy could not be a leased-in worker because, as an employee of ECS, he was an independent contractor. In support, they produced testimony from several witnesses and pointed to the agreement between Diatom and ECS in which ECS is referred to as an "independent contractor" to Diatom. However, under the definition at issue, even if Randy were an independent contractor to Diatom through his employment at ECS, he would still be considered a "leased-in worker" under the policy.[23]

---

[22] The evidence in the record is unclear on whether Randy was continuously employed by ECS from March 1991 until his death.

[23] During trial, the Segers asked one of their experts, Jay Thompson, if under the dictionary definitions of the words "lease," "worker," and "in," Randy could be considered a leased-in worker. Mr. Thompson answered that Randy, in his opinion, would not be a leased-in worker or employee of Diatom. However, Mr. Thompson was not provided with the definition of "leased-in worker" that was required as a result of the court of appeals' opinions. *See St. Joseph Hosp.*, 94 S.W.3d at 530; *Diatom Drilling Co.*, 280 S.W.3d at 283. An expert's opinion that relies on flawed methodology is unreliable, even if the underlying data is sound. *Merrell Dow Pharm., Inc.*, 953 S.W.2d at 714. Unreliable expert testimony is legally no evidence. *Id.* Because Mr. Thompson's testimony regarding Randy's status as a leased-in worker relied on an incorrect definition, it is unreliable, and therefore, no evidence.

The undisputed evidence in the record clearly shows that the elements of the court of appeals' definition were met. The evidence in the record is legally insufficient to support the jury's verdict because "the evidence conclusively establishes the opposite" of the fact vital to the verdict. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004). Accordingly, the evidence is legally insufficient to support the jury's finding that Randy was not a leased-in worker.

### III. Conclusion

Because the evidence is legally insufficient to support a jury verdict to the contrary, we hold that Randall Seger was a leased-in worker as a matter of law. The Segers' claimed loss was therefore excluded from coverage under the CGL policy and their *Stowers* action fails as a result. We do not reach the damages issue addressed by the court of appeals because the coverage issue is dispositive. We therefore affirm the judgment of the court of appeals, which reversed the trial court's judgment and rendered judgment that the Segers take nothing, but on different grounds. *See Trinity Universal Ins. Co. v. Bleeker*, 966 S.W.2d 489, 492 (Tex. 1998); *Maldonado*, 963 S.W.2d at 41–42.

_____
Paul W. Green
Justice

OPINION DELIVERED:  June 17, 2016