

# NUMBER 13-23-00437-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE BOERNE HOTEL, LTD. D/B/A THE BEVY HOTEL, BOERNE HOTEL GENERAL PARTNER, LLC, AND PHOENIX HOSPITALITY BOERNE, LLC

## On Petition for Writ of Mandamus.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Silva and Peña
Memorandum Opinion by Justice Peña[1]**

By petition for writ of mandamus, relators Boerne Hotel, Ltd. d/b/a The Bevy Hotel,

Boerne Hotel General Partner, LLC, and Phoenix Hospitality Boerne, LLC seek to compel

---

[1] *See* TEX. R. APP. P. 52.8(d) ("When denying relief, the court may hand down an opinion but is not required to do so. When granting relief, the court must hand down an opinion as in any other case."); *id.* R. 47.4 (distinguishing opinions and memorandum opinions).

the trial court[2] to vacate an order granting their motion to compel a medical examination as part of discovery in a personal injury suit. *See* TEX. R. CIV. P. 204.1 (stating that physical and mental examinations may be ordered as part of discovery for good cause). Specifically, relators argue that the order is erroneous to the extent that it requires the examination to be video and audio recorded, limits the examination to a five-hour period, and requires the examining physicians to disclose the specific tests that they will administer prior to the examination. We conditionally grant relief in part and deny in part.

## I. BACKGROUND

Real parties in interest Leticia and Jorge Peña filed suit against relators, Alamo System Industries, LLC, and Alfaro Clemente d/b/a Alfaro's Carpeting[3] alleging that Leticia tripped and fell on a "dangerous expansion joint cover" at The Bevy Hotel in Boerne, Texas. The Peñas asserted that Leticia fell "head-first onto the floor" rendering her unconscious, that she "incurred a traumatic brain injury," and that she consequently "suffer[s] from impaired cognitive function."

Relators filed a "Joint Motion to Compel [an] Independent Medical Examination" for Leticia.[4] According to their joint motion, the Peñas' physician Dr. Amy Duckwall examined Leticia and concluded that she suffered "a [m]ild [n]eurocognitive [d]isorder" that was "likely related to a traumatic brain injury she sustained from the incident giving rise to this lawsuit." Dr. Duckwall recommended that Leticia obtain further treatment for

---

[2] This cause arises from trial court cause number C-4095-21-J in the 430th District Court of Hidalgo County, Texas, and the respondent is the Honorable Israel Ramon Jr. *See id.* R. 52.2.

[3] The name of this defendant appears in the record as Alfaro Clemente d/b/a Alfaro's Carpeting, Clemente Alfaro d/b/a Alfaro's Carpets, and Clemente Alfaro d/b/a Alfaro's Carpeting.

[4] Rule 204 does not use the term "independent," and the term is a misnomer insofar as the rule contemplates a compelled clinical examination performed at the behest of one party for litigation purposes. *See* TEX. R. CIV. P. 204.1.

2

her injury in the form of further consultations, a neuropsychological reevaluation, individual counseling sessions, and cognitive rehabilitation therapy.

Relators alleged that the Peñas had offered Dr. Duckwall's opinions and expert report to support their contentions regarding causation and damages, and thus a Rule 204 examination would be relevant to the issues in controversy, was supported by good cause, and was required by fundamental fairness. *See id.* Relators stated that they had retained clinical neuropsychologist Dr. Gilbert Martinez and psychiatrist Dr. Christopher Ticknor to examine Leticia and they requested the trial court to order Leticia to undergo their proposed examination. Relators supported their joint motion with affidavits from Drs. Martinez and Ticknor. Dr. Martinez testified in relevant part:

3.  I conduct evaluations to characterize behavioral and cognitive changes and treat patients if [indicated]. I have been retained by counsel for [relators] to evaluate [Leticia's] alleged claim of cognitive impairment stemming from her fall that forms the basis of this lawsuit, including the existence, cause, nature, extent, and proper treatment for those injuries, if any. I have reviewed extensive medical records regarding [Leticia], including, but not limited to, the reports of Dr. Duckwall, which includes her assessment techniques, relevant observations, testing results and observations, summary of results, and diagnostic impressions.

4.  For me to provide a comprehensive analysis of [Leticia's] neuropsychological conditions as they relate to the incident made the basis of this suit, I request the opportunity to perform an interview, neuropsychological evaluation, and administer standard neuropsychological tests that are in common use by neuropsychologists. This examination would take place in one day and would include paper and pencil testing and tasks, and clinical interviewing. The actual examination time will be approximately eight (8) hours, depending on [Leticia's] cooperation and speed in taking the tests and filling out the evaluation forms. . . .

. . . .

6.  Notwithstanding the fact that [Leticia] has undergone neuropsychological testing with Dr. Duckwall in January 2020,

3

conducting my own neuropsychological examination of [Leticia] will assist me in my assessment of her current psychological and neuropsychological condition and will assist me in my determination of whether and to what extent [Leticia] has sustained any psychological or neurocognitive impairment, the likely cause of any such impairment, and any future treatment. Conducting my own neuropsychological examination allows me to administer a battery of tests of my choosing based upon my review of the medical records and other documents in this case, and based upon my assessment from an in person clinical interview of [Leticia] in which I would directly interact with [Leticia] and make my own first-hand behavioral observations, and ask my own questions and follow up questions taking into account my behavioral observations made during the interview.

7. Furthermore, I do not believe the assessments performed by Dr. Duckwall meet current interpretive standards as described by the American Academy of Clinical Neuropsychology and the American Psychological Association. . . . Accordingly, additional testing is needed due to the insufficient nature of Dr. Duckwall's test protocol.

8. I have also considered the fact that [Leticia] has already undergone neuropsychological testing by Dr. Duckwall and any potential "practice effects," and based upon my training and experience, I will limit the possible impact of practice effects using alternate forms, and different measures to assess cognitive domains or, when applicable, by statistically accounting for any expected practice based on information provided in respective test manuals.

9. My examination would consist of a clinical interview and psychometric testing, which includes performance and symptom validity testing, cognitive testing, and assessment of emotional functioning in accordance with the guidelines provided by the American Psychological Association and American Academy of Clinical Neuropsychology. All tests utilized will be standardized (e.g., provided in the same manner across examinees) and will have proven reliability and validity based on research and professional practice guidelines. . . . The tests will be chosen from the instruments listed below:

Neuropsychological Assessment Battery (NAB)
Personality Assessment Inventory (PAI)
Wechsler Memory Scale - IV
Wechsler Adult Intelligence Scale - Fourth Edition
Advanced Clinical Solutions for the WAIS-IV/WMS-IV subtests
Wisconsin Card Sorting Test

4

Green's Word Memory Test (WMT)
Delis-Kaplan Executive Functions Test (D-KEFS)
Wide Range Achievement Test - 4
Grooved Pegboard Test
Category Test
Repeatable Battery for the Assessment of Neuropsychological Status
Rey 15 Item Memory Task
Rey-Osterrieth Complex Figure Test
CNS Vital Signs
Digit Vigilance
Structured Inventory of Malingered Symptomatology (SIMS)
Ruff[ ]2 & 7 Selective Attention Test
California Verbal Learning Test – 2
Modified Somatic Perceptions Questionnaire
Connors Continuous Performance Test (CPT-2)
Test of Memory Malingering (TOMM)
Trauma Symptom Inventory - 2
Paced Auditory Serial Addition Test
Minnesota Multiphasic Personality Inventory-2-RF (MMPI-2-RF)
Dementia Rating Scale - 2
Manual Finger Tapping Test
Wide Range [Achievement] Test - Fourth Edition (WRAT-4)
Medical Symptom Validity Test (MSVT)
Grip Strength
Judgment of Line Orientation
Line Bisection Test
Clock & Cross Drawings
Verbal Selective Reminding Test
Multilingual Aphasia Examination
Dot Counting Test
Neurobehavioral Symptom Inventory (NSI)
Victoria Symptom Validity Test (VSVT)
Verbal Fluency Measures
Mesulam Letter Cancellation Test
Trail Making Test
Beck Depression Inventory – 2
Behavior Rating Inventory of Executive Function – Adult

I cannot otherwise list or identify the specific tests to be provided to [Leticia] by name because this would provide information to [her] that could bias her report and performance during my examination. Providing a patient with prior knowledge of the testing introduces a potential source of error in the assessment process and would be inappropriate. There is consensus among clinical neuropsychologists that the names of the tests to be administered to

5

a patient should not be provided in advance. Providing a list of the standardized tests to be administered during my evaluation of [Leticia] ahead of time would allow [her] the opportunity to prepare since considerable information about these tests is now available online, which would be a potential source of error in the assessment process. Moreover, I cannot predict which psychological and neuropsychological instruments I will include in the battery until I have completed my clinical interview and listened to [Leticia's] current symptoms and concerns. It is standard practice of clinical neuropsychologists to withhold from both clinical patients and individuals that are seen as part of a legal proceeding the testing information prior to the evaluation. Thus, these details will be included in my report from my examination rather than in this affidavit.

10. My clinical interview of [Leticia] will assess her personal recollection of the incident, her immediate and ongoing symptoms and complaints, and her medical, psychiatric, and social history. This clinical interview will also address any interval change since Dr. Duckwall's examinations. . . . The clinical interview portion would also involve psychiatrist, [Dr. Ticknor]. Dr. Ticknor's participation in the clinical interview portion of the examination would further assist me in identifying the specific neuropsychological tests to be administered to [Leticia]. . . .

. . . .

12. My testing of [Leticia] must be conducted without the presence of a third party, either in person, or by videotape or audiotape. An examinee who is aware that he or she is being observed by a third party, either in person, or by videotape or audiotape, may alter his or her behavior or affect performance, and as a result, affect the validity of the test results. Additionally, recording of testing is not permitted in conjunction with professional guidelines and position statements from the National Academy of Neuropsychology, the American Psychological Association, and other national neuropsychological organizations stating that testing be conducted in a secure manner that does not comprise the validity of the test, and test publishers advise that content of tests administered are trade secrets. In addition, the American Academy of Clinical Neuropsychology provides practice guidelines for neuropsychological assessment and consultation. Those practice guidelines require clinicians, such as me, to safeguard and protect the proprietary aspects of standardized psychological and neuropsychological instruments due to the significant time and expense associated with standardizing those instruments. However, the clinical interview portion of the

examination may be audiotaped or videotaped at the discretion of Dr. Ticknor.

Dr. Ticknor's affidavit provided, in relevant part:

3.    I conduct evaluations to assess psychiatric and neuropsychological factors, personality traits, somatization disorders, and possible psychopathology. I have been retained by [relators] to evaluate [Leticia's] alleged claim of cognitive impairment stemming from a fall that forms the basis of this lawsuit, including the existence, cause, nature, extent, and proper treatment for those injuries, if any. I have reviewed extensive medical records regarding [Leticia], including, but not limited to, the reports of Dr. Duckwall, which includes her assessment techniques, relevant observations, testing results and observations, summary of results, and diagnostic impressions.

4.    For me to provide a comprehensive analysis of [Leticia's] psychiatric and psychological condition as it relates to the incident made the basis of this suit, I request the opportunity to perform my own evaluation of [Leticia]. My portion of the requested examination will be conducted with a clinical neuropsychologist and last no more than 2 to 2 ½ hours. The examination will not be invasive nor will it include any diagnostic laboratory tests or a physical examination. [Leticia] will not be required to disrobe during the requested examination nor will blood be drawn or x-rays taken.

. . . .

6.    Notwithstanding the fact that [Leticia] has undergone neuropsychological testing with Dr. Duckwall in January 2020, conducting my own evaluation of [Leticia] will assist me in my assessment of her current psychological condition and will assist me in my determination of whether and to what extent [Leticia] has sustained any psychological or neurocognitive impairment, the likely cause of any such impairment, and any future treatment. Conducting my own evaluation allows me to administer a battery of tests of my choosing based upon my review of the medical records and other documents in this case, and based upon my assessment from an in person clinical interview of [Leticia] in which I would directly interact with [Leticia] and make my own first-hand behavioral observations and ask my own questions and follow up questions taking into account my behavioral observations made during the interview.

7.    My clinical interview and mental status examination would be conducted jointly with neuropsychologist [Dr. Martinez], and would

7

further assist him in identifying the specific neuropsychological tests to be administered to [Leticia].

. . . .

9. My examination of [Leticia] must be conducted without the presence of a third party, either in person, or by videotape. The clinical interview portion of the examination may be audio recorded but not videorecorded. An examinee who is videorecorded is aware she may be observed by a third party in the future and may find the video recording distracting or intrusive. Videotaping may lead some people to alter [their] behavior or affect performance, and as a result, affect the validity of the clinical interview results. Additionally, recording of neuropsychological testing is not permitted in conjunction with professional guidelines and position statements from the National Academy of Neuropsychology, the American Psychological Association, and other national neuropsychological organizations stating that testing be conducted in a secure manner that does not comprise the validity of the tests. Test publishers also advise that content of tests administered are trade secrets. In addition, the American Academy of Clinical Neuropsychology provides practice guidelines for neuropsychological assessments and consultation. Those practice guidelines require clinicians, such as me, to safeguard and protect the proprietary aspects of standardized psychological and neuropsychological instruments due to the significant time and expense associated with standardizing those instruments.

The Peñas filed a response to relators' joint motion opposing the examination in its entirety on grounds that relators had not established good cause for the examination. *See id.* In the alternative, the Peñas asserted that an examination, if any, should be limited to four hours in duration, that Drs. Martinez and Ticknor should be required to specify the tests to be performed in advance, and that the examination should be videotaped and audio recorded. The Peñas included several exhibits in their response, including a portion of a statement from the National Academy of Neuropsychology differentiating the responsibilities of neuropsychologists who administer clinical exams from those who

8

administer court-ordered exams, which they asserted supported their request that the examination be recorded.[5]

Relators filed a reply to the Peñas' response, contending among other matters, that the Peñas were seeking approximately $1,653,518 in future medical expenses and good cause had been shown for the examination.

The trial court held a non-evidentiary hearing on relators' joint motion to compel and took the matter under advisement. On October 2, 2023, the trial court signed an order granting relators' motion which generally stated that "[t]he manner, conditions[,] and scope of the examination shall be as described" in Drs. Martinez and Ticknor's affidavits. However, the order limited the examination to five hours in duration, required Drs. Martinez and Ticknor to specify the tests they intended to perform in advance of the examination, and ordered the examination to be both videotaped and audio recorded.

This original proceeding ensued. Relators assert by three issues that: (1) the trial court abused its discretion "by imposing unwarranted and improper video and audio recording requirements for the exam"; (2) the trial court abused its discretion by ordering

---

[5] The excerpt provides:

> Requests to have independent and other forensic neuropsychological examinations observed by an interested party or recorded in an audio or video format are common. In some jurisdictions, examinees have a statutory right to have their independent examinations observed or recorded. Observation by an involved third party and recording of a neuropsychological examination are problematic and raise complex issues, such as whether the results could be invalidated and how test security will be maintained. The National Academy of Neuropsychology (NAN) position paper on third party observers, as well as that of the American Academy of Clinical Neuropsychology (AACN), apply in this context . . . . Forensic examiners who receive such requests need to be knowledgeable of the relevant issues and are encouraged to respond only after careful consideration.

Shane S. Bush, *Independent and court-ordered forensic neuropsychological examinations: Official statement of the National Academy of Neuropsychology*, 20 ARCHIVES CLINICAL NEUROPSYCH. 997, 1000 (2005).

9

Drs. Martinez and Ticknor "to disclose the battery of tests in advance and requiring the exam to be completed within five hours—conditions that were not equally imposed" on Dr. Duckwall; and (3) they lack an adequate remedy by appeal to address these errors. Relators further filed with this Court an emergency motion for temporary relief requesting to stay the examination and trial court proceedings pending the resolution of their petition for writ of mandamus.

This Court granted relators' emergency motion, stayed the underlying proceedings, and requested the Peñas, or any others whose interest would be directly affected by the relief sought, to file a response to the petition for writ of mandamus. *See* TEX. R. APP. P. 52.2, 52.4, 52.8. Real party in interest Alamo System Industries, LLC filed a first amended response to the petition for writ of mandamus stating that it agrees with the relief sought by relators. The Peñas filed a response asserting that the trial court's limitations were reasonable.[6] Relators have filed a reply in support of their contentions in this original proceeding.

## II.    STANDARD OF REVIEW

Mandamus is an extraordinary and discretionary remedy. *See In re Allstate Indem. Co.*, 622 S.W.3d 870, 883 (Tex. 2021) (orig. proceeding); *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 138 (Tex. 2004) (orig. proceeding). The relator must show that (1) the trial

---

[6] The Peñas subsequently filed a motion requesting that we lift our stay, in part, to allow for "fact discovery" pending the resolution of this original proceeding. Relators filed a response in opposition to this motion asserting that partially lifting the stay would "lead to confusion," "prejudice [r]elators' ability to conduct proper discovery," and "deprive [r]elators of the benefits of their medical experts' opinions during the course of discovery and thus their ability to develop their defenses" in the lawsuit. We agree with relators. In any event, because we are presently disposing of the petition for writ of mandamus, we dismiss the Peñas' motion as moot.

10

court abused its discretion, and (2) the relator lacks an adequate remedy by appeal. *In re USAA Gen. Indem. Co.*, 624 S.W.3d 782, 787 (Tex. 2021) (orig. proceeding); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 135–36; *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding). A trial court abuses its discretion when it acts with disregard for guiding rules or principles or when it acts in an arbitrary or unreasonable manner. *In re Garza*, 544 S.W.3d at 840. We determine the adequacy of an appellate remedy by balancing the benefits of mandamus review against the detriments. *In re Acad., Ltd.*, 625 S.W.3d 19, 32 (Tex. 2021) (orig. proceeding); *In re Essex Ins.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136.

### III.   RULE 204 EXAMINATIONS

Under the rules of civil procedure, a trial court may compel a party to submit to a mental or physical examination as part of discovery "only for good cause shown" and "when the mental or physical condition . . . of a party . . . is in controversy." TEX. R. CIV. P. 204.1(c)(1). The "good cause" requirement "balance[s] the movant's right to a fair trial and the other party's right to privacy." *In re Sherwin-Williams Co.*, 668 S.W.3d 368, 371 (Tex. 2023) (orig. proceeding) (per curiam) (quoting *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 303 (Tex. 2016) (orig. proceeding)).[7] In order to establish good cause:

> [T]he movant must show that (1) the examination is relevant to the issue in controversy and is likely to lead to relevant evidence, (2) there is a "reasonable nexus between the examination and the condition in

---

[7] In terms of the fair trial standard, we note that "[t]he proper objective of [the] rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law." TEX. R. CIV. P. 1. "And basic to the right to a fair trial—indeed, basic to the very essence of the adversarial process—is that each party have the opportunity to adequately and vigorously present any material claims and defenses." *Sw. Ref. Co., Inc. v. Bernal*, 22 S.W.3d 425, 437 (Tex. 2000).

controversy," and (3) the desired information "cannot be obtained by less intrusive means."

*In re Sherwin-Williams Co.*, 688 S.W.3d at 371 (quoting *In re H.E.B. Grocery Co.*, 492 S.W.3d at 303.

"When the existence, extent, and cause of an injury are in controversy, an exam intended to glean information regarding those issues will satisfy the relevance requirement." *In re Auburn Creek Ltd. P'ship*, 655 S.W.3d 837, 841–42 (Tex. 2022) (orig. proceeding) (per curiam). To show a reasonable nexus, the movant is required to provide more than "conclusory allegations" and "mere relevance to the case," but must instead provide "evidence that the requested examination 'directly relates to the condition in controversy.'" *Id.* (quoting *In re H.E.B. Grocery Co.*, 492 S.W.3d at 303); *see Coates v. Whittington*, 758 S.W.2d 749, 751 (Tex. 1988) (orig. proceeding). We measure whether the movant has shown that the examination would be the least intrusive means to discover the required information by the fair trial standard, and we consider "the importance of the discovery sought and the ability to find it elsewhere," particularly considering "whether the exam is likely to reveal information necessary to assess the complained-of injuries beyond what could be obtained from reviewing any medical records available to the expert." *In re Auburn Creek Ltd. P'ship*, 655 S.W.3d at 842.

If the movant meets its burden to show good cause and the trial court grants the motion for an examination, the trial court's order "must be in writing and must specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made." TEX. R. CIV. P. 204.1(d). The trial court possesses discretion to place reasonable limits on an examination and exercises this discretion with reference to the fair trial standard. *In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d 1, 10,

12

11 (Tex. App.—Corpus Christi–Edinburg 2019, orig. proceeding); *In re Offshore Marine Contractors, Inc.*, 496 S.W.3d 796, 803 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding).

## IV.   ANALYSIS

Relators contend that the trial court abused its discretion by requiring audio and video recording of the examination, limiting its duration to five hours, and requiring Drs. Martinez and Ticknor to disclose the tests that they would perform in advance. Relators assert that these "requirements are not authorized under Texas law[,] are unworkable, improperly favor the Peñas, invade the province of qualified experts, and prevent [relators] from being able to defend [themselves] at trial against the Peñas' damages claims." Relators assert that the "order's improper requirements and limitations essentially deny [relators'] right to an examination and contravene this Court's prior holdings." The Peñas assert generally that these conditions are reasonable and within the trial court's discretion.

## A.   Recording

We first address that part of the trial court's order requiring the examination to be audio taped and videorecorded. Citing our decision in *Society*, relators assert that the Peñas were required to show that special circumstances necessitated video and audio recording of the examination, yet they failed to do so, thus the trial court abused its discretion in requiring this condition for the examination. *See In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 18. The Peñas argue, in contrast, that *Society* is distinguishable, but if we determine otherwise, we should reconsider our decision in that case.

13

In *Society*, we held that a party seeking to have an examination recorded must show "special circumstances or a particularized need" for the recording "supported by evidence including specific facts amounting to good cause," and we determine whether this burden has been met on a case-by-case basis. *Id.* at 17–18. Under this standard, "generalized concerns about accuracy, reliability, and methodology for the examination do not constitute good cause for recording," nor does

> the inherently adversarial nature of the examination, the fact that the examining physician was selected or paid for by opposing counsel, the theoretical potential for misconduct during the examination, the desire to obtain an accurate, dispute-free version of what was said, or the fear that the examination would become a de facto deposition.

*Id.* at 15. This standard is based on cases construing the analogous federal rule regarding examinations conducted for litigation. *See id.* at 12–15; *see also Coates*, 758 S.W.2d at 751 (explaining that the predecessor rule to Rule 204.1 was derived from Federal Rule of Civil Procedure 35 and that "[f]ederal courts' construction of Rule 35 is thus helpful to an analysis of [Rule 204]"). We found this approach consistent with Texas law and the fair trial standard. *See In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 15–16. Because the proponent of recording in that case did not demonstrate good cause, we held that the trial court abused its discretion in requiring the examination to be recorded. *Id.* at 18–19.

The Peñas assert that *Society* is distinguishable from this case because in *Society*, the proponent of recording the examination did not present evidence that "called into question the conclusory statements made by the defense experts there to the effect that examinations should not be recorded," but here, the Peñas presented evidence that the examination to be conducted by Drs. Martinez and Ticknor would be litigation-driven and

14

would not give rise to a clinician-patient relationship in which recording the examination would be inappropriate. The Peñas assert that by presenting this evidence, they shifted the burden to *relators* to show that the examination should *not* be recorded. The Peñas assert that relators failed to carry that burden because, *inter alia*, relators' contention that recording might alter Leticia's examination results is based on mere speculation.

We disagree with the Peñas' assertions. Fundamentally, on these facts, *Society* is not distinguishable. All examinations conducted pursuant to Rule 204 are litigation-driven, and such examinations are not recorded as a matter of course. Further, we have already rejected the contention that the adversarial nature of such an examination alone constitutes good cause for recording. *See id.* We thus reject the Peñas' contentions that *Society* is distinguishable, or that relators otherwise bore the burden to show that the examination should not be recorded.[8]

We turn our attention to the Peñas' policy arguments for revisiting our precedent. They assert that recording the examination will protect the parties' right to a fair trial and that recording prevents any disputes regarding the results of the examination, discourages gamesmanship, and mitigates the potential for abuse of the examination. The Peñas further argue that:

> Numerous legislatures and courts across the county have recognized these varied interests militating in favor of the recording of defense-driven medical examination[s] in the course of litigation and have required that they be recorded or otherwise be overseen by someone other than the examinee and the expert conducting the examination.

---

[8] The hearing on the motion to compel was not evidentiary. Based on our review of the Peñas' response and exhibits, nothing therein could be construed as good cause for recording the examination.

15

The Peñas essentially urge us to reconsider *Society* and "align Texas law with the supermajority of states that have considered the issue and make recording the default" procedure for Rule 204 examinations.[9]

While we appreciate the policy concerns raised by the Peñas regarding the challenges inherent in examinations conducted for litigation purposes, we decline to accept the Peñas' invitation to depart from our precedent. The Peñas offer neither persuasive nor controlling authority in support of altering our approach, and in fact, other Texas cases have adopted our approach in *Society*. *See In re UV Logistics, LLC*, No. 01-23-00044-CV, 2023 WL 8192532, at *8 (Tex. App.—Houston [1st Dist.] Nov. 28, 2023, orig. proceeding) (concluding that *Society* is "well-reasoned" and "sets out a reasonable rule for determining whether recording an independent examination should be permitted"); *see also In re Redbird Trails Apartments*, No. 05-20-00284-CV, 2020 WL 3445811, at *4 (Tex. App.—Dallas June 24, 2020, orig. proceeding [mand. filed]) (mem. op.) (following *Society* in concluding that "in the absence of proof of special circumstances or a particularized need for videotaping or having an attorney present at the opposing party's examination, one party should not be required to videotape the examination when the other party did not"). Further, the Peñas' suggested approach is inconsistent with the fair trial standard employed by Texas courts. *See In re Auburn Creek Ltd. P'ship*, 655 S.W.3d at 842; *In re Offshore Marine Contractors, Inc.*, 496 S.W.3d at 803.

---

[9] Supporting their argument with relevant citations, the Peñas assert that eight states have rules that require recording examinations, eight states "hold that recording or other attendance is the default rule through case law," two states present "mixed case law on this issue," one state considers the matter discretionary, and six other states require "good cause or the like" for recording or an external presence. The Peñas do not address federal authority on point.

16

Here, Dr. Duckwall's examination of Leticia was not recorded, and we conclude that the trial court abused its discretion in ordering Drs. Martinez and Ticknor's examination to be recorded where good cause for recording was not shown. *See In re UV Logistics, LLC*, 2023 WL 8192532, at *8; *In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 17–18; *see also In re Redbird Trails Apartments*, 2020 WL 3445811, at *4. We sustain relators' first issue.

## B.     Timing and Specification

In their second issue, relators assert that the trial court erred by ordering Drs. Martinez and Ticknor "to disclose the battery of tests in advance and requiring the exam to be completed within five hours—conditions that were not equally imposed" on Dr. Duckwall. We note that Rule 204 specifically requires the trial court to specify the "manner, conditions, and scope of the examination." TEX. R. CIV. P. 204.1(d); *see also In re Reyes*, No. 02-20-00071-CV, 2020 WL 1294923, at *2, (Tex. App.—Fort Worth Mar. 19, 2020, orig. proceeding) (mem. op.) (conditionally granting mandamus relief where the trial court's order compelling an examination "demonstrate[d] a clear failure to comply with Rule 204.1's requirements").

We first address that aspect of the trial court's order requiring Drs. Martinez and Ticknor to "specify the tests they intend to perform on [Leticia]." Relators assert that "[t]he Texas Supreme Court's precedent [of] *In re Auburn Creek* is . . . clear—for mental exams, the expert cannot be required to disclose the specific testing battery in advance because that could bias the results and introduce error." *See In re Auburn Creek Ltd. P'ship*, 655 S.W.3d at 842. In *Auburn*, the trial court denied the relators' motion for a Rule 204 medical examination, and the supreme court held that the trial court abused its discretion in

concluding that the relators had not shown good cause for an examination. *See id.* at 839.

In *Auburn*, relators had supported their request for an examination with an affidavit from

the same Dr. Martinez who is present in this case, in which, as here, he asserted that he

should not be required to disclose the tests that he would administer:

> Dr. Martinez testified that the neuropsychological exams would assess the claimed injuries, including memory impairment, language difficulties, anxiety, depression, and processing deficiencies for each of the six plaintiffs. This wide variety of disorders and symptoms is listed in Dr. Webb's report on the [plaintiffs'] behalf. Although Dr. Martinez provided a lengthy list of possible tests, many of which were similar to the ones Dr. Webb performed, the [plaintiffs] did not object to any particular test. Dr. Martinez testified that he could not be certain which tests would be appropriate until he interacts with each plaintiff in a clinical interview and makes first-hand behavioral observations. Dr. Martinez also identified the risk of bias and error if the patients are aware of the exact list of tests to be performed. This evidence shows a reasonable nexus between the proposed examinations and the conditions at issue.

*Id.* at 842 (internal footnote omitted). In a footnote, the supreme court distinguished *In re*

*Estabrook*, No. 10-20-00175-CV, 2020 WL 6192923, at *1–5 (Tex. App.—Waco Oct. 21,

2020, orig. proceeding) (mem. op.) on the facts. *Id.* at 842 n.2. In *Estabrook*, the Tenth

Court of Appeals agreed that the plaintiff's mental condition was in controversy and

merited a Rule 204 examination but found that the scope of the trial court's order providing

for a neuropsychological examination was too broad because it "did not limit the

neuropsychological examination to the mental conditions in controversy . . . ." *In re*

*Estabrook*, 2020 WL 6192923, at *3–4. The supreme court distinguished *Auburn* based

on the specificity of Dr. Martinez's expert testimony regarding reasonable nexus, the

"much broader list of conditions" presented, and the "more detailed" proposed orders

granting the Rule 204 examinations. *See In re Auburn Creek Ltd. P'ship*, 655 S.W.3d at

842 & n.2.

18

We decline to accept relators' contention that *Auburn* stands for the broad proposition that experts are never required to disclose the specific tests that will be administered in advance of the examination. The precise issue presented in *Auburn* was whether the trial court abused its discretion in denying a Rule 204 examination, and the supreme court's discussion regarding disclosure of the tests for the examination was dicta. *Id.* at 839; *see Seger v. Yorkshire Ins.*, 503 S.W.3d 388, 399 (Tex. 2016) (discussing the precedential value of judicial dictum and obiter dictum). Further, to the extent that *Auburn* addressed the conditions for the examination, it did so in the well-established analytical framework that we use for Rule 204 examinations. *Id.* at 842 & n.2. Specifically, the supreme court applied a fact-based analysis to determine whether the manner, conditions, and scope of the examination were supported by good cause and ensured a fair trial. *Id.*; *see generally In re Sherwin-Williams Co.*, 688 S.W.3d at 371; *In re H.E.B. Grocery Co.*, 492 S.W.3d at 303; *see also In re Evans*, No. 03-20-00532-CV, 2021 WL 278944, at *5 (Tex. App.—Austin Jan. 28, 2021, orig. proceeding) (mem. op.) ("Although there may be cases where there are reasons not to require the movant's psychiatrist to identify the possible universe of tests that may be given to the nonmovant, on the record before us in this case, there was no evidence before the trial court to support counsel's argument."); *In re Kirby Inland Marine, LP*, No. 01-18-00383-CV, 2018 WL 3468476, at *3–4 (Tex. App.—Houston [1st Dist.] July 18, 2018, orig. proceeding) (mem. op.) ("Because the time and advance notice limitations imposed by the trial court deny Kirby the ability to conduct a full evaluation, the limitations violate fundamental fairness and the fair-trial standard, and therefore constitute an abuse of discretion."). In this regard, we consider the record that was before the trial court when considering a motion to compel

a Rule 204 examination. *See In re Sanchez*, 571 S.W.3d 833, 837 (Tex. App.—Houston [1st Dist.] 2018, orig. proceeding).

Here, Dr. Martinez offered affidavit testimony that included a list of the potential tests that he would administer in his examination. Dr. Martinez explicitly testified that he could not further identify the specific tests that he would administer because it could bias the results, introduce a potential source of error, and allow Leticia "the opportunity to prepare" for the examination. He further testified that he "cannot predict which psychological and neuropsychological instruments I will include in the battery until I have completed my clinical interview and listened to [Leticia's] current symptoms and concerns." Dr. Martinez also testified that, "[i]t is standard practice of clinical neuropsychologists to withhold from both clinical patients and individuals that are seen as part of a legal proceeding the testing information prior to the evaluation." Thus, as in *Auburn*, the Peñas were explicitly advised as to the list of potential tests that Dr. Martinez might administer, but they did not object to any particular one of the proposed tests, and they did not offer evidence indicating that the administration of any of the proposed tests would be improper under the applicable standard. Based upon the foregoing facts and circumstances, we conclude that the trial court abused its discretion in requiring Dr. Martinez to specify the tests that he would administer in advance. *See In re Sherwin-Williams Co.*, 688 S.W.3d at 371; *In re Auburn Creek Ltd. P'ship*, 655 S.W.3d at 842 & n.2; *In re H.E.B. Grocery Co.*, 492 S.W.3d at 303.

Our analysis differs regarding Dr. Ticknor. By affidavit, Dr. Ticknor advised that his part of the examination would include "a battery of tests of [his] choosing based upon [his] review of the medical records and other documents in this case, and based upon [his]

20

assessment from an in person clinical interview of [Leticia]." Dr. Ticknor did not provide a list of potential tests that he might administer. Unlike Dr. Martinez, Dr. Ticknor did not testify that he was unable to specifically identify the tests that he would administer to Leticia.

Based on the foregoing, an order allowing an examination "as described" in Dr. Ticknor's affidavit would fail to meet Rule 204's requirement for an order allowing an examination to "specify the . . . manner, conditions, and scope of the examination." TEX. R. CIV. P. 204.1(d). When the record lacks information regarding the manner, conditions, and scope of the examination, there is nothing substantiating the required reasonable nexus between the examination and the conditions in controversy. *See id.*; *In re Sherwin-Williams Co.*, 688 S.W.3d at 371. And Dr. Ticknor's failure to more specifically explain the potential tests that he might administer renders the Peñas unable to lodge objections to any specific tests or otherwise assert that any specific part of the examination does not directly relate to the condition in controversy. *See In re Sherwin-Williams Co.*, 688 S.W.3d at 371; *In re Auburn Creek Ltd. P'ship*, 655 S.W.3d at 841–42. Further, requiring an examinee to undergo an array of undisclosed exams which might or might not possess a reasonable nexus to the conditions in controversy or otherwise fall within standard professional protocols would unduly impinge on Leticia's privacy rights in a manner not necessary to accord the relators a fair trial. *In re Auburn Creek Ltd. P'ship*, 655 S.W.3d at 842. The provision in the trial court's order requiring Dr. Ticknor to specify the tests that he will administer in advance of the examination remedies this deficiency. Accordingly, we conclude that the trial court did not abuse its discretion by ordering Dr. Ticknor to "specify the tests" he intends to perform before the examination.

21

We turn our attention to the five-hour time limitation imposed by the trial court. We note that the Peñas had requested that the Rule 204 examination be limited to four hours. In their petition for writ of mandamus, relators assert that they "should have the opportunity to have the same amount of time Dr. Duckwall had when she conducted her evaluation—eight hours." There are several problems with relators' contentions in this regard. First, there is no direct evidence in the record regarding the duration of Dr. Duckwall's exam. Relators have estimated that Dr. Duckwall spent between "6.6 to 10.0 hours" examining Leticia based on the number and type of tests that she administered, or alternatively, that Dr. Duckwall's billing records indicate that she spent eight hours over the course of two days examining Leticia.

Second, the amount of time that relators seek is not consistently reflected in their pleadings. In their joint motion to compel, the relators stated that "[t]he entire evaluation will likely comprise about 7 or 8 hours and can be completed in one day." In their reply, to the Peñas' response to their motion to compel the examination, the relators asserted that the time they had requested, "between 6–8 hours," was consistent with the duration of Dr. Duckwall's examination. Thus, the trial court's award of a five-hour examination differs from that requested by a variance of one to three hours.

Third, there is no evidence in the record that a five-hour examination would be insufficient. Dr. Martinez testified by affidavit that the "actual examination time will be approximately eight (8) hours," that "actual testing typically takes up to 6-8 hours of face-to-face administration, in addition to breaks throughout the day as needed, as well as an approximately one-hour break for lunch," and that his clinical interview, in which Dr. Ticknor would participate, "will last 90 to 120 minutes." In contrast, Dr. Ticknor testified

22

that his "portion of the requested examination will be conducted with a clinical neuropsychologist," we assume Dr. Martinez, and that it will "last no more than 2 to 2 ½ hours." These affidavits seem to establish an estimate of the outmost bounds for how long it will take to perform the examination and are somewhat vague as to how much time will be involved in the actual examination. However, neither expert testified that an eight hour examination is absolutely required for the examination to be legitimate or that a five hour limitation would render the examination insufficient. *See In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 10, 11; *In re Offshore Marine Contractors, Inc.*, 496 S.W.3d at 803; *see also In re Kirby Inland Marine, LP*, 2018 WL 3468476, at *1 (concluding that the trial court abused its discretion in imposing a time restriction for an examination when the record contained a physician's affidavit stating that "the time restriction essentially would prevent him from performing an effective evaluation").

In examining this issue, we are cognizant that we "must be careful not to prevent the development of medical testimony that would allow the [relators] to fully investigate the conditions" that Leticia has placed in issue. *In re Ten Hagen Excavating, Inc.*, 435 S.W.3d 859, 867 (Tex. App.—Dallas 2014, orig. proceeding). However, there is no evidence before us that the trial court's temporal limitation for the examination presents such an impediment. We further observe that the fair trial standard does not require absolute parity, nor could it, between an examination conducted by a treating physician and one conducted by professionals engaged for litigation. Based on the foregoing, we conclude that the trial court did not abuse its discretion in determining that a five-hour time limit was reasonable based on the factual circumstances indicated by the record and the fair trial standard. *See In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 10,

11; *In re Offshore Marine Contractors, Inc.*, 496 S.W.3d at 803; *see also In re Kirby Inland Marine, LP*, 2018 WL 3468476, at *1–2 (concluding that it was an abuse of discretion to allow only a two-hour examination when the examining physician testified "that the time restriction essentially would prevent him from performing an effective evaluation").

In summary, we sustain relators' second issue in part regarding the trial court's requirement for Dr. Martinez to specify the tests he will perform in advance. We overrule relators' second issue in all other respects.

## C.     Remedy by Appeal

In their third issue, relators assert that they lack an adequate remedy by appeal to address the trial court's errors. We agree. Balancing the benefits of mandamus review against the detriments and examining the specific facts and circumstances of this case, we conclude that appeal is an inadequate remedy. *See In re Acad., Ltd.*, 625 S.W.3d at 32; *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136. The supreme court has repeatedly held that appeal is an inadequate remedy to address errors with regard to Rule 204 examinations that impair the movant's ability to develop expert testimony fully and fairly and thus severely compromises the ability to present a defense in the case. *See In re Sherwin-Williams Co.*, 668 S.W.3d at 372; *In re Auburn Creek Ltd. P'ship*, 655 S.W.3d at 843; *In re H.E.B. Grocery Co.*, 492 S.W.3d at 304. As in *H.E.B.*, relators' defense in this case centers on their challenges to the nature, extent, and cause of Leticia's injuries, and these issues depend significantly on expert testimony. *See In re H.E.B. Grocery Co.*, 492 S.W.3d at 304. Relators seek to allow Drs. Martinez and Ticknor the same opportunity that Dr. Duckwall had to fully develop and present their opinions, thereby ensuring fundamental fairness and a fair trial. *See id.*; *In re Soc'y of Our Lady of Most Holy Trinity*,

622 S.W.3d at 19–20; *In re Offshore Marine Contractors, Inc.*, 496 S.W.3d at 804; *In re Ten Hagen Excavating, Inc.*, 435 S.W.3d at 864. We conclude that relators lack an adequate remedy by appeal. We sustain their third issue.

## V.  CONCLUSION

The Court, having examined and fully considered relators' petition for writ of mandamus, the responses, and the applicable law, is of the opinion that relators have met their burden to obtain mandamus relief, in part, as stated herein. Accordingly, we lift the stay previously imposed in this case. *See* TEX. R. APP. P. 52.10. We conditionally grant the petition for writ of mandamus in part and direct the trial court to vacate those portions of its October 2, 2023 order requiring the examination to be videotaped and audio recorded and requiring Dr. Martinez to specify the tests he intends to perform in advance. We deny the petition for writ of mandamus as to all other relief sought. Our writ will issue only if the trial court fails to promptly comply.

L. ARON PEÑA JR.
Justice

Delivered and filed on the
14th day of February, 2024.

25